## THE STATE *v.* JOHNSON, ADMINISTRATOR.

PARTIES.—*Pleading.*—*Surplusage.*—Where a cause of action exists in favor of the State, and the action is brought in the name of the State for a certain specified use, the words designating such use will be considered as surplusage, and the action will be regarded as an action brought by the State.

CONTRACT.—*Public Policy.*—*House of Refuge.*—A written promise to pay to the State of Indiana a certain sum of money upon the condition that the empowered authorities of the State should locate at Plainfield, in said State, the reform school for juvenile offenders, the authority to locate said school being vested in the Governor and certain commissioners, who had no personal interest in the matter, and who complied with said condition, was not against public policy; and though by the act of March 8th, 1867 (Acts 1867, p. 137), "to establish a house of refuge," etc., no authority to receive such donations of money was expressly given or denied, yet the act of 1855, 2 G. & H. 660, expressly authorizing such donations for such purpose, was not in this respect repealed by said act of 1867.

From the Hendricks Common Pleas.

*J. C. Denny,* Attorney General, and *L. Ritter,* for the State.

*J. V. Hadley* and *J. S. Ogden,* for appellee.

BUSKIRK, J.—This was an action by the appellant against the appellee, as administrator of the estate of Jesse Faulkner, deceased, upon a written agreement executed by the decedent, in his lifetime, whereby he agreed to pay the State of Indiana the sum of three hundred dollars, upon the condition that the authorized authorities of the State should locate, at or near Plainfield, Hendricks county, Indiana, the reform school for juvenile offenders. The complaint avers a performance of the condition.

There was a trial of the issue formed, and a finding for the defendant, upon the ground that it was not sufficiently shown by the evidence that the decedent had executed the instrument sued upon. A new trial was awarded, and upon another trial there was a finding for the plaintiff below and appellant here.

A motion in arrest of judgment was made, based upon the following grounds:

1. Because the plaintiff had not legal capacity to sue in this action, for the reason that there is no law authorizing the State of Indiana to institute a suit for the house of refuge.

2. Because the complaint does not contain facts sufficient to constitute a cause of action against the defendant.

3. Because there is no law authorizing the State of Indiana to receive donations of money to aid in the construction of the house of refuge.

The motion was sustained, and the judgment arrested, from which judgment the plaintiff appeals, and assigns for error the action of the court in arresting judgment.

Waiving the question whether a motion in arrest of judgment presents any question as to the legal capacity of the plaintiff to maintain the action, we are of opinion that the objection is not well founded. By the agreement, which is the foundation of the action, the decedent agreed to pay the sum named directly to the State of Indiana, and in such case the action should have been brought in the name of the State, without any averment as for whose use it was brought. *Shane* v. *Francis*, 30 Ind. 92. The action being brought in the name of the State, we shall regard as surplusage all that is said about its being brought for the use of the house of refuge.

The conclusion reached disposes of the second cause assigned for the arrest of judgment.

The third reason urged in arrest of judgment presents for decision a very difficult and important question, and that is, whether the Governor and commissioners, in the absence of express legislative authority, were authorized to receive donations in money, on the condition that the house of refuge for the correction and reformation of juvenile offenders was located at or near Plainfield, in the county of Hendricks and State of Indiana.

By the third section of " an act to establish a house of refuge for the correction and reformation of juvenile offend-

ers" (approved March 8th, 1867), the Governor is authorized to purchase or receive donations of real estate for the site of such house.  See Acts 1867, p. 137.

By the twenty-fifth section of said act the sum of fifty thousand dollars is appropriated out of the State treasury for carrying out the provisions of said act.

By the twenty-sixth section of such act the Governor and the commissioners created thereby are authorized to sell certain described real estate belonging to the State, the proceeds whereof are to be applied to the purchase of other grounds and the erection of suitable buildings for such institution.

In no part of the act is there any authority given to the Governor and commissioners to receive donations in money to aid in the purchase of a site, or the erection of buildings, or to influence the location of such institution.

It is earnestly contended by counsel for appellee that the agreement of the decedent is against public policy, and therefore illegal, and constitutes no consideration to support the promise.

Story, in his work on contracts, in sections 674 and 675, says:

"Sec. 674.  We now come to the third class of illegal contracts, namely, contracts which violate the rules of public policy.   The rule of law, applicable to this class of cases, is, that all agreements which contravene the public policy are void, whether they be in violation of law or of morals, or tend to interfere with those artificial rules which are supposed by the law to be beneficial to the interests of society, or obstruct the prospective objects flowing indirectly from some positive legal injunction or prohibition.

"Sec. 675. Public policy is in its nature so uncertain and fluctuating, varying with the habits and fashions of the day, with the growth of commerce and the usages of trade, that it is difficult to determine its limits with any degree of exactness.   It has never been defined by the courts, but has been left loose and free of definition, in the same manner as fraud.   This rule may, however, be safely laid down, that

wherever any contract conflicts with the morals of the time, and contravenes any established interest of society, it is void, as being against public policy."

Inasmuch as public policy is in its nature uncertain, and as its limits have not been defined with exactness, we find it necessary to examine the adjudged cases, with the view of ascertaining what contracts have, and what have not, been held to be against public policy.

1. It is settled that a contract to procure the passage of an act of the legislature by any sinister means, or by using personal influence with the members, is void, as being inconsistent with public policy and the integrity of our political institutions. *Marshall* v. *Baltimore and Ohio Railroad Co.*, 16 How. 314; *Clippinger* v. *Hepbaugh*, 5 Watts & S. 315; *Harris* v. *Roof's Executors*, 10 Barb. 489; *Rose* v. *Truax*, 21 Barb. 361.

In the case of *Marshall* v. *Baltimore and Ohio Railroad Co.*, *supra*, the court say:

"It is an undoubted principle of the common law, that it will not lend its aid to enforce a contract to do an act that is illegal; or which is inconsistent with sound morals or public policy; or which tends to corrupt or contaminate, by improper influences, the integrity of our social or political institutions. Hence all contracts to evade the revenue laws are void. Persons entering into the marriage relation should be free from extraneous or deceptive influences; hence the law avoids all contracts to pay money for procuring a marriage. It is the interest of the State that all places of public trust should be filled by men of capacity and integrity, and that the appointing power should be shielded from influences which may prevent the best selection; hence the law annuls every contract for procuring the appointment or election of any person to an office. The pardoning power, committed to the executive, should be exercised as free from any improper bias or influence as the trial of the convict before the court; consequently, the law will not enforce a contract to pay money for soliciting peti-

tions or using influence to obtain a pardon. Legislators should act from high considerations of public duty. Public policy and sound morality do therefore imperatively require that courts should put the stamp of their disapprobation on every act, and pronounce void every contract the ultimate or probable tendency of which would be to sully the purity or mislead the judgments of those to whom the high trust of legislation is confided.

"All persons whose interests may in any way be affected by any public or private act of the legislature have an undoubted right to urge their claims and arguments, either in person or by counsel professing to act for them, before legislative committees, as well as in the courts of justice. But where persons act as counsel or agents, or in any representative capacity, *it is due to those before whom they plead or solicit, that they should honestly appear in their true characters,* so that their arguments and representations, openly and candidly made, may receive their just weight and consideration. A hired advocate or agent, assuming to act in a different character, is practising deceit on the legislature. Advice or information flowing from the unbiased judgment of disinterested persons will naturally be received with more confidence and less scrupulously examined than where the recommendations are known to be the result of pecuniary interest, or the arguments prompted and pressed by hope of a large contingent reward, and the agent 'stimulated to active partisanship by the strong lure of high profit.' Any attempts to deceive persons intrusted with the high functions of legislation, by secret combinations, or to create or bring into operation undue influences of any kind, have all the injurious effects of a direct fraud on the public.

"Legislators should act with a single eye to the true interest of the whole people, and the courts of justice can give no countenance to the use of means which may subject them to be misled by the pertinacious importunity and indirect influences of interested and unscrupulous agents or solicitors.

"Influences secretly urged under false and covert pretences must necessarily operate deleteriously on legislative action, whether it be employed to obtain the passage of private or public acts. Bribes, in the shape of high contingent compensation, must necessarily lead to the use of improper means and the exercise of undue influence. Their necessary consequence is the demoralization of the agent who covenants for them; he is soon brought to believe that any means which will produce so beneficial a result to himself are 'proper means;' and that a share of these profits may have the same effect of quickening the perceptions and warming the zeal of influential or 'careless' members in favor of his bill. The use of such means and such agents will have the effect to subject the state governments to the combined capital of wealthy corporations, and produce universal corruption, commencing with the representative and ending with the elector. Speculators in legislation, public and private, a compact corps of venal solicitors, vending their secret influences, will infest the capital of the Union and of every state, till corruption shall become the normal condition of the body politic, and it will be said of us as of Rome—'*Omne Romœ Venale.*'"

In *Clippinger* v. *Hepbaugh*, 5 Watts & S. 315, the court say:

"The whole reasoning of the court, however, goes to establish these propositions, which cannot be reasonably denied. That the law will not aid in enforcing any contract that is illegal, or the consideration of which is inconsistent with public policy and sound morality, or the integrity of the domestic, civil or political institutions of a State. That a contract to procure or endeavor to procure the passage of an act of the legislature, by any sinister means, or even by using personal influence with the members, would be void, as being inconsistent with public policy and the integrity of our political institutions. And any agreement for a contingent fee, to be paid on the passage of a legislative act, would be illegal and void, because it would be a strong incentive

to the exercise of personal and sinister influences to effect the object. These are broad fundamental principles, to the truth of which we subscribe, and which cover the whole ground on which this case rests. It matters not that nothing improper was done or was expected to be done by the plaintiff. It is enough that such is the tendency of the contract, that it is contrary to sound morality and public policy, leading necessarily, in the hands of designing and corrupt men, to improper tampering with members, and the use of an extraneous, secret influence over an important branch of the government. It may not corrupt all; but if it corrupts or tends to corrupt some, or if it deceives or tends to deceive or mislead some, that is sufficient to stamp its character with the seal of reprobation before a judicial tribunal."

2. An agreement for compensation for procuring a contract from the government to furnish its supplies is against public policy, and cannot be enforced by the courts. *Tool Company* v. *Norris*, 2 Wal. 45.

In the above case the court say:

"The question, then, is this: Can an agreement for compensation to procure a contract from the government to furnish its supplies be enforced by the courts? We have no hesitation in answering the question in the negative. All contracts for supplies should be made with those, and with those only, who will execute them most faithfully, and at the least expense to the government. Considerations as to the most efficient and economical mode of meeting the public wants should alone control, in this respect, the action of every department of the government. No other consideration can lawfully enter into the transaction, so far as the government is concerned. Such is the rule of public policy; and whatever tends to introduce any other elements into the transaction, is against public policy. That agreements, like the one under consideration, have this tendency, is manifest. They tend to introduce personal solicitation, and personal influence, as elements in the procurement of contracts; and

thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds.

"The principle which determines the invalidity of the agreement in question has been asserted in a great variety of cases. It has been asserted in cases relating to agreements for compensation to procure legislation. These have been uniformly declared invalid, and the decisions have not turned upon the question, whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements. Legislation should be prompted solely from considerations of the public good, and the best means of advancing it. Whatever tends to divert the attention of legislators from their high duties, to mislead their judgments, or to substitute other motives for their conduct than the advancement of the public interests, must necessarily and directly tend to impair the integrity of our political institutions. Agreements for compensation contingent upon success suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception.

"There is no real difference in principle between agreements to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments. The introduction of improper elements to control the action of both, is the direct and inevitable result of all such arrangements.

"The same principle has also been applied, in numerous instances, to agreements for compensation to procure appointments to public offices. These offices are trusts, held solely for the public good, and should be conferred from considerations of the ability, integrity, fidelity, and fitness for the position of the appointee. No other considerations can properly be regarded by the appointing power. Whatever introduces other elements to control this power, must necessarily lower the character of the appointments, to the great detriment of the public. Agreements for compensation to procure these appointments tend directly and necessarily to

introduce such elements. The law, therefore, from this tendency alone, adjudges these agreements inconsistent with sound morals and public policy.

"Other agreements of an analogous character might be mentioned, which the courts, for the same or similar reasons, refuse to uphold. It is unnecessary to state them particularly; it is sufficient to observe, generally, that all agreements for pecuniary considerations to control the business operations of the government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void as against public policy, without reference to the question, whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements; and it closes the door to temptation, by refusing them recognition in any of the courts of the country."

3. Railway companies are *quasi* public corporations, and the directors act as agents of the company, and also as trustees of the public, clothed with an important public trust, and any agreement to pay to such directors, or other agents, any sum of money, or to deed real estate upon the condition that the line of said road be located on a certain route, or that a depot be located at a certain place, is against public policy and void. *Fuller* v. *Dame,* 18 Pick. 472; *The Pacific Railroad Co.* v. *Seely,* 45 Mo. 212; *Holladay* v. *Patterson,* in the Supreme Court of Oregon, published in 2 Cent. Law Journal, 63.

4. All agreements by which one person engages to pay another for his aid or influence in procuring an appointment to office are illegal and void. *Gray* v. *Hook,* 4 N. Y. 449, and cases there cited.

5. A contract founded upon a promise and engagement to procure signatures and obtain a pardon from the Governor for one convicted of a criminal offence and sentenced to punishment is unlawful and can not be enforced by an action. *Hatzfield* v. *Gulden,* 7 Watts, 152.

6. It is settled that any arrangement or combination

among the parties applying for a street improvement, whereby a few individuals, desirous of causing the grading and paving to be done, procure the signatures of others to the application by paying them a consideration therefor, either directly or indirectly, is a fraud in law and contrary to public policy. *Maguire* v. *Smock*, 42 Ind. 1; *Howard* v. *The First Independent Church of Baltimore*, 18 Md. 451.

7. An agreement based upon a confederation or combination of persons for the purpose of preventing competition at an auction sale and of depressing the price of property below its fair market value is against public policy and void. Story on Con., sec. 677, and authorities cited.

8. An agreement in general or total restraint of trade is void, though it be founded on a legal and valuable consideration; but an agreement in partial restraint of trade, restricting it within reasonable limits as to time and place, is valid. Story on Con., sections 679 to 686, and the numerous cases cited.

9. Contracts in restraint of marriage are void upon grounds of public policy, and so are conditions in wills in restraint of marriage. Story on Con., sections 687 to 693.

10. Marriage brokerage contracts, by which are meant contracts or agreements to negotiate a marriage between two parties, for a compensation, are utterly void, and incapable of confirmation. Story on Con., sec. 694.

11. A wager on a subject which is illegal, or which offends against public policy, is void. Story on Con., secs. 695, 697, and authorities.

12. Contracts to do acts which are indictable or punishable criminally, or to conceal and compound such acts, or to suppress evidence in a criminal prosecution, are void. Story on Con., sec. 700, *et seq*.

13. An agreement with a public officer to compensate him for doing an act which it is his legal duty to do without compensation is void, because every officer is bound to do his duty conformably to law. Story on Con., sec. 703.

14. All contracts to indemnify officers against prospective non-feasance, malfeasance, or misfeasance of their official duties are void, but a promise to indemnify an officer for the execution of an act apparently legal is good. Story on Con., secs. 704, 709.

15. Contracts for the sale of public offices are in violation of public duty and void. Story on Con., sec. 709.

16. Contracts for the maintenance of suits, or for champerty, or embracery, or bribery or extortion are void. Story on Con., secs. 710, 716.

In Illinois, where one subscribed to a paper promising to pay to the county commissioners a sum for the purpose of defraying in part the expenses of a court-house, provided it should be located and erected on a certain described lot, and the house was erected on that lot, it was decided by the Supreme Court of that State that the commissioners could not maintain an action on that promise, because, among other reasons, it was a promise to pay them for an act which they were required by law to do, and was therefore void as being against public policy. *County Commissioners of Randolph County* v. *Jones,* Breese, 237.

17. But in *Carpenter* v. *Mather,* 3 Scam. 374, it was held that where a statute fixed the seat of government at Springfield, upon the condition that the inhabitants of said town should subscribe a certain sum of money towards erecting the State House, and executed their bonds for the payment of the same, a bond given under such statute was founded upon a sufficient consideration, and was valid. The opinion was rendered by DOUGLASS, J., and was based upon the authority of the case next cited.

18. In *State Treasurer* v. *Cross,* 9 Vt. 289, it was held that a subscription by which the subscribers individually promise to pay the Treasurer of State the sums annexed to their names towards building a State House, is not void for want of consideration, or as against public policy. The court say:

"The propriety of any particular location of public

buildings may depend, in some measure, upon the sum proposed to be given by the citizens of any place. The public interest obviously requires that such location should be made with a view to all the circumstances, and the greater or less burthen to the whole State would be an important circumstance to be taken into consideration, in determining between several places, in other respects equally convenient. The increased value of the property, in the vicinity of public buildings, would seem to require that those, who are benefited, should contribute some part of the increase, for the purpose of erecting them, rather than that the whole advantage should accrue to them, and the expense be wholly borne by the citizens generally. We can see no foundation for the objection made to this subscription, on the ground of public policy or propriety."

19. In *Bull* v. *Talcot*, 2 Root, Conn. 119, it was held that a recovery could be had on a subscription whereby the subscribers agreed to pay certain sums on the condition that a court-house was erected upon a certain lot which was described.

20. In *Commissioners of the Canal Fund* v. *Perry*, 5 Ohio, 56, it was held that undertakings by written subscription to contribute money or other property in aid of public works are valid contracts that may be enforced in courts of justice. The court say:

"It has been repeatedly decided in this State, and elsewhere, that promises to pay money for the erection of school and court-houses, churches and bridges, would, the work being undertaken or done, sustain the action of assumpsit. A moral obligation is sufficient to support an action on an express promise. * * *

" The subscription we are now called to examine does not rest alone upon the general principle, but may invoke to its aid a positive enactment of the legislature. * * * *

" The contract here is not against good policy or good morals, nor against law, but in conformity with its express provisions."

21. In *Caldwell* v. *Harrison*, 11 Ala. 755, it was held that an action could be maintained upon a subscription whereby the signers agreed to pay certain sums upon the condition that a certain bridge should be erected within a limited time according to a plan to be agreed upon by certain public commissioners, a performance being shown.

22. That an agreement to give money for the erection of colleges, churches, school-houses, and other charitable purposes, on conditions, is valid, we cite the following cases:

*University of Vermont* v. *Buell*, 2 Vt. 48; *Religious Society* v. *Stone*, 7 Johns. 112; *M'Auley* v. *Billenger*, 20 Johns. 89; *Collier* v. *Baptist Education Society*, 8 B. Mon. 68; *The Trustees of Amherst Academy* v. *Cowls*, 6 Pick. 427; *The Trustees, etc.,* v. *Davis*, 11 Mass. 113; *Williams College* v. *Danforth*, 12 Pick. 541.

In the case last cited, the subscription was made upon the express condition that the college should remain at Williamstown where it was then located.

23. In *George* v. *Harris*, 4 N. H. 533, the action was based upon a subscription which declared, that "for the purpose of providing a suitable court-house in the town of Plymouth, and to have said town continue a half shire, we," etc., "promise to pay," etc., on the condition that some person would give a half acre of land for a site; and it was held that the subscribers were liable to pay their subscriptions.

24. The case of *Odineal* v. *Barry*, 24 Miss. 1, has an important bearing upon the question under examination. The facts are substantially these, as they appear in the opinion of the court: The court-house in Lowndes county had become old and dilapidated, and the board of police had determined to build a new one. Certain citizens of Columbus petitioned the board to build the new court-house on a different lot in a different part of the town of Columbus from that on which the old one was situated, and the board was inclined to accept the proposition, and to change the

location. Craven and Wade and certain persons owning property near the old court-house, which would have been diminished in value by the removal of it to another part of the town, proposed to pay the county two thousand dollars towards the erection of the new building, if the board of police would build it on the site of the old court-house. This proposition the board accepted, and did build it on the same lot. The note sued on was given in consideration of this action of the board, and in part performance of the contract to pay them therefor. It is also admitted that the property of the defendants would have been diminished in value, if the court-house had not been so erected and had been built on the other lot to which it was proposed to remove it. The court say:

"This brings us to the consideration of the last point, which we deem it necessary to notice in this opinion. Was the consideration on which this promissory note was given illegal? We do not think so. We recognize fully the doctrine of this court in the case of *Merrell* v. *Legrand,* 1 How. Miss. 150, that the consideration of a contract must not be merely of benefit to one party, or prejudice to the other; but that the benefit or prejudice must arise from a legal, and not an illegal or immoral act. No contract will be enforced in a court of justice which is founded on an illegal or immoral consideration, or which is contrary to public policy. In this case, it is not pretended that there was any express law prohibiting the board of police from making this contract, or that it was a contract immoral in itself; but it is said it was a contract against public policy, and, therefore, should not be enforced. What principle of public policy does it violate? The members of the board of police, as individuals, will not receive any portion of the money for which the note was given. At the time of the contract it was not intended or expected that they should receive it. It was not a proposition by the defendants to pay them so much as individuals, in consideration that they would not change the site of the court-house. If it had been, it would have been clearly ille-

gal, and could not have been enforced. But the contract was made by them in their official capacity, for the benefit of the county. When collected, the money will become the property of the county, and be under its direction and control, applicable to any purpose that may be deemed beneficial, or promotive of its interests."

In *Clark* v. *Polk County*, 19 Iowa, 248, the court say: ·

"While public policy should not be made to override principle, nor yet to overturn or run counter to an unbroken current of authorities, it may nevertheless be properly considered by judicial tribunals in determining a question whereon the authorities are in conflict, or the principle on which it rests is more or less uncertain. Or, as in this case, it may be considered in fortifying the authorities, and the more unerringly to fix the principle on which the case rests."

In *Richmond* v. *Dubuque, etc., R. R. Co.*, 26 Iowa, 191, the court say:

"But further than this, the power of courts to declare a contract void for being in contravention of sound public policy, is a very delicate and undefined power, and like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."

After mature and thoughtful consideration, we have arrived at the conclusion that the contract sued upon is not against sound public policy. The Governor was not prohibited from receiving donations in money. He was invested with a discretion. His duty required him to exercise his best judgment in making a location of a public institution. It was proper for him, in determining the location, to take into consideration any aid which might be offered by any particular locality. The sum donated lessened the public burden and placed it on those who would receive a personal advantage by such location. The money donated went into the fund provided for the erection of suitable buildings. The Governor received no part of the money, and had no personal interest in the matter. He acted for the public good only. Then, how could his judgment be perverted by the

giving of money which was used to carry out a charitable purpose? There is no pretence that there was any favoritism or partiality on the part of the Governor or the commissioners who aided him by their counsel. Nor is it claimed that a bad location was made. In the case of railroads and other *quasi* public corporations, the directors are stockholders and have a personal and pecuniary interest in all donations made. Under these circumstances, they might, in consulting their own interest, lose sight of the public good. In the case in judgment, the Governor was not subjected to any such temptation.

But we are not required to rest our judgment in the present case solely upon the general doctrine of public policy.

It is provided by section 2 of article 9 of our state constitution, that " the General Assembly shall provide houses of refuge for the correction and reformation of juvenile offenders." In compliance with the above imperative requirement, the legislature, on the 3d day of March, 1855, passed an act for the erection of a house of refuge. The Governor, Treasurer of State, and Superintendent of Public Instruction were authorized and directed to purchase not exceeding forty acres of ground for the site of such institution, and, in making the selection, regard was to be had to the center of population, cheapness of living, and facility of access.

The second section of said act provides: " The said officers of State may also take into consideration any proposed donation of land, and any proposed donation of money or materials, towards the erection of such buildings, from any county, or from the citizens of any county, but shall not be wholly governed by such proposed donations, but shall select that point which will combine economy to the State with the several requisites mentioned in the preceding section ;. and should said officers of State accept such donations, they shall proceed to secure the same to the State in the manner that may seem most advisable." 2 G. & H. 660.

The above act remains in force, except in so far as the same was modified or repealed by the act of 1867. The

purpose of the act was defeated by the smallness of the appropriation made. It relates to the same subject and has the same object as the act of 1867. The two acts are to be construed together, and effect is to be given to both, if possible. In placing a construction upon the latter, reference is to be had to the former act. Buskirk's Pr. 358, and authorities cited; *Prather* v. *The J., M. & I. R. R. Co., ante,* p. 32.

We are of opinion that, instead of the contract sued upon being against law and the public policy of the State, it is in strict conformity to both.

It necessarily results that the court erred in arresting judgment.

The judgment is reversed, with costs; and the cause is remanded, with directions to the court below to overrule the motion in arrest, and to render judgment on the finding, computing interest thereon from the time it was rendered to the rendition of judgment.