[Civ. No. 50. Fourth Appellate District.—January 23, 1930.]

COUNTY OF SAN BERNARDINO, Appellant, v. GATE CITY CREAMERY COMPANY (a Corporation), Respondent.

George H. Johnson, District Attorney, and M. O. Hert for Appellant.

W. E. Byrne for Respondent.

SLOANE, P. J.—This appeal was taken to the Supreme Court of the State of California and thereafter transferred to the Fourth District Court of Appeal, upon a judgment of dismissal of plaintiff's action, after demurrer sustained to second amended complaint and failure of plaintiff to amend.

The action was brought by the County of San Bernardino to recover from the defendant, Gate City Creamery Company, a corporation, a balance of $1800 alleged to be due and owing upon a subscription contract, whereby the defendant had undertaken and agreed to pay a contribution of $2,000 toward the purchase of a site for the county courthouse.

The subscription agreement was executed by the defendant and a number of other citizens and taxpayers of San Bernardino for the payment of various individual amounts, and is in words and figures as follows:

"January 12, 1925.

"We, the undersigned citizens and taxpayers of San Bernardino County, promise to pay to the Board of Supervisors on demand, the sums placed opposite our names, provided said sum is to be used for the purchase of ground situate on Third and Arrowhead Streets, comprising six hundred feet on Arrowhead Avenue to a depth of three hundred feet, said land to be purchased by the Board of Supervisors, if possible, and to be condemned, if. necessary. The purchase price of the entire property is not expected to exceed Seventy-five thousand dollars, the salvage of the houses thereon to go toward the purchase of said property, and to be deducted from the total of Seventy-five thousand dollars. The Board of Supervisors is to agree to use this property for the purpose of erecting thereon the County courthouse and other buildings which are necessary, such as jail, hall of records, etc. In the event that a bond issue for the Court House should fail, this agreement is to be null and void, unless the Board of Supervisors decide to build the County Court House and other county buildings on said property by direct taxation. In such case, the undersigned agree to

furnish the same (designated below) amount of money ($75,000.00) as per their respective signatures. The undersigned also agree to pay the cost of all condemnation proceedings on any property that cannot be bought outright.''

The courthouse site designated in this agreement was accepted and purchased by the Board of Supervisors and the county courthouse constructed thereon. Defendant paid $200 upon its subscription contract, and having refused to pay any further amount this action was brought to collect the unpaid balance. The second amended complaint alleges:

''V.

''That after the execution of the agreement herein set out, the plaintiff herein, relying upon the promises of the defendant and of the various persons signing said agreement; and agreeing to contribute money toward the buying of said site for said buildings, bought the said site and said lands for said purpose, and proceeded to, and has constructed thereon the buildings mentioned and designated in said agreement, and said buildings are completed and are now occupied by the officers and governmental agencies of plaintiff herein and by the Superior Courts of the State of California, in and for the County of San Bernardino and the various other agents of said plaintiff. . . .

''VII.

''That by reason of the subscription of the said defendant hereinbefore referred to, and by reason of the said plaintiff relying thereon and acting as hereinbefore alleged in good faith upon said subscription, and by reason of the payment by said defendant of the said sum of two hundred dollars to apply thereon, the said defendant is, and should be estopped from denying the validity of said subscription agreement and is and should be estopped from denying and refusing to pay the remainder of said subscription so made.''

This amended complaint was demurred to on the ground that the same ''does not state facts sufficient to constitute a cause of action against said defendant.''

The defense relied upon by defendant to avoid the obligation of this agreement is that the contract is void and unenforceable, ''is against public policy and illegal in that it has a tendency to influence the board of supervisors in

the discharge of their official duty by trammeling their judgment in the matter of a selection of a courthouse site in which the board should have been left free to act as the public interest alone may dictate or require.''

It is conceded and indeed affirmatively alleged in the complaint that the board of supervisors, in selecting the site for the courthouse, was influenced in making such selection, by these stipulated contributions to the purchase price. The sole question to be considered is as to whether or not the acceptance and consideration of such contributions is, in the state of California, against public policy.

It may be conceded, as set out in respondent's brief, that ''subscription contracts to acquire particular sites and to erect thereon public buildings are of three classes:

''(1). To the first class belong all such contracts which are authorized by statute; and as each state has a right to determine its own questions of public policy, contracts so authorized are not illegal.

''(2). To the second class belong all such contracts where the location and selection of the site is determined by the votes at an election held for that purpose''; it being the law that the influence of such agreements upon the electors themselves is not against public policy.

''(3). To the third class belong all such contracts where the contract is not expressly authorized by the statute, or the selection of the site determined by a popular vote, but where the location sought to be influenced by the subscription is left solely to the judgment of the administrative officers, who are elected by the people to exercise their judgment and determination for the best interests of the entire community, freely and unhampered, and without undue influence.

The case at bar belongs either to the first or third of these classifications. If it can be held that the legislature of the state of California has authorized the consideration and acceptance of this class of subscriptions it will be unnecessary to go further into the discussion of this case.

In enumerating the powers of boards of supervisors, subdivision 6 of section 1041 of the Political Code includes the power: ''to purchase, receive by donation, lease or otherwise acquire water rights, or real or personal property necessary for the use of the county for courthouse, jail, hospital

. . . and other public purposes, and also property upon which to sink wells to obtain water for sprinkling roads and other county purposes, and to improve, preserve, take care of, manage and control the same."

Section 4052a of the Political Code provides that:

"The Board of Supervisors are hereby authorized to accept or reject, as they may deem advisable, any gift, bequest or devise heretofore or that hereafter may be made to or in favor of the County represented by such Board in their official capacity, or to or in their favor, in trust for any public purpose, and to hold and dispose of the same and the income and increase thereof, to and for such lawful uses and purposes as have been or may hereafter be prescribed in the terms of such gift, bequest or devise."

It is contended by respondent that the subscription which is the subject matter of the present case is not a gift or donation; that it is merely a conditional promise to contribute to the County of San Bernardino the specified sum of money in consideration of the location of the county courthouse at a designated place. It certainly does not come within the legal definition of a gift. Section 1146 of the Civil Code defines a gift as "a transfer of personal property made voluntarily, and without consideration." The instrument in question certainly does not transfer any property or thing, and the promise to do so is not absolute, and is for an express consideration which imports something of value to be received by the donor.

There is reason to assume, however, that contributions of this character to the public use were intended by the legislature to come within the provisions of the sections of the statutes above quoted. The use of the words in section 4052a of the Political Code "in trust for any public purpose, and to hold and dispose of the same and the income and increase thereof to and for such lawful uses and purposes as have been or hereafter may be prescribed in the terms of such gift, bequest or devise," would seem to indicate transactions specifying some particular use and application of the gift directing and restricting the dominion of the public over it to that specific purpose. What may be said to be the almost universal accompaniment of such contributions to the public, gives further force to the language of the legislature as being intended to apply to subscrip-

tions of the character here under consideration. It rarely happens that such subscriptions to public buildings are not conditioned upon the choice of some specified location. As is said by the Supreme Court of Ohio, in the case of *Commissioners of Canal Fund* v. *Perry*, 5 Ohio, 56, an action on a contract to subscribe to the location of a canal:

"We think the common usual method of doing such things was in the contemplation of the law, the obtaining a promise to give or convey at an agreed time upon whatever condition the giver chose to impose and the obtaining the written evidence of the undertaking. One promises to give a thousand dollars a year if the canal goes through his land. The construction contended for by the defendant's counsel would deprive the State of power to avail itself of aid under such condition. We are unable to perceive any sound reason against the making a valid contract under the law, to pay on the happening of the condition."

Whether or not the above code citations may be construed as empowering the board of supervisors to accept and take into consideration a subscription of this kind, they obviously have their bearing upon the question of public policy in this state. They recognize and authorize the acceptance of private contributions in aid of public enterprises, and the fact that legislative sanction or acceptance of such contributions by popular vote removes the ban of corrupting and undue influence, requires only an additional step to sanction such considerations on the part of other representatives of the public interest.

We do not deem it necessary, however, to go to the extent of holding that there is express authority in these code provisions for accepting and considering a subscription of this character in the selection of a site for a public building. Considering the liability created by such a subscription purely on the grounds of public policy, we think that the weight of reasoning and authority is against the contention of respondent. The principle applicable to the definition of the term is well expressed and generally accepted as set forth in 6 California Jurisprudence, at page 109 et seq.:

"Public policy is a term of vague and uncertain meaning, and it has been said that few cases can arise in which its application may not be disputed. The term has not been

precisely defined by the courts, but has been left loose and free of definition in the same manner as fraud. The authorities all agree, however, that a contract is not void as against public policy unless it is injurious to the interests of the public or contravenes some established interest of society. Fundamentally it pertains to the law-making power to declare what contracts are against public policy. The policy of the state can be ascertained only by reference to the constitution and laws passed under it, or which is the same thing, to the principles underlying and recognized by the constitution and laws. Courts are apt to encroach upon the domain of the law-making branch of the government if they characterize a transaction as invalid because contrary to public policy, unless the transaction contravenes some positive statute or some well established rule of law.''

█ It will be conceded that any influence brought to bear upon a public board or official which has the evil tendency to influence such officer or board in the discharge of its public duty by trammeling the judgment in matters about which these public representatives should be left free to act as the public interests alone may dictate or require, is against public policy, and if such vitiating element is present and has that tendency in the eyes of the law, it makes no difference what the actual motive of the public officials in the particular instance may be. █ But is such a tendency present or apparent in the case in question? Here is a condition where the Board of Supervisors of San Bernardino County is called upon to select and procure a site for a county courthouse. In this, as in every such determination, one of the important considerations to be taken into account is the cost to the public. Other things being equal, it would clearly be the duty of the board to select the site which could be obtained at the least expense to the public. Of two locations offered, otherwise equally desirable, one at the full market value of the property, and the other as a donation, irrespective of the fact that the motive for the gift might be a selfish and self-serving one, it would be clearly the right and duty of the official body to accept the offered donation. What difference in principle is involved if a part or if the whole of the cost of a building site is tendered by a

subscription from individuals who expect a profit by a location?

We have examined each of the numerous authorities cited by counsel in this case and find that in most of the decisions where the location of a public building has been influenced by private contributions to the cost, and the transaction held to be against public policy, the circumstances have been such that the contribution offered or suggested some personal gain or benefit to the officials having the decision in hand.

In the case of *Spence* v. *Harvey,* 22 Cal. 336 [83 Am. Dec. 69], cited by respondent, the question of the location of a postoffice was involved, and the offer of financial aid inured directly to the postmaster. In holding this agreement against public policy, the decision recites:

"It is said that this particular contract is not against public policy, because in fact the place selected was suitable and convenient for the public use. The question of the validity of the contract does not, however, depend upon the circumstance whether it can be shown that the public has in fact suffered any detriment, but whether the contract is in its nature such as might have been injurious to the public, and which the public policy requires should not be made by public officers in regard to the discharge of their duties. Upon this point the case of *Fuller* v. *Dame,* 18 Pick. (Mass.) 472, is pertinent. In that case it appears that Fuller was a stockholder in the Boston and Worcester Railroad Corporation and for a consideration he agreed to use his influence in procuring that corporation to locate its depot at a particular place in Boston, it being expressed in the agreement that Fuller was of the opinion that the road ought, from a view to the public good and the good of the stockholders, to locate its depot at that place. The contract was held to be void on the ground that the road was established for the public accommodation although a private corporation, and that the public had an interest in the question of the location of the depot, and that though the contract was not made to induce a party to do an unlawful act, it put him under an influence to do that which might injuriously affect the interests of the public. . . . 'Nor is it any satisfactory answer to say that when the agreement was entered into he had come to the opinion

that the location in question was the best for the interests of the public and for the interests of the corporation. That opinion might be changed by new views and new offers; and besides the terms upon which this boon was to be obtained was still an open question. But upon all these questions the influence of the promise of separate and distinct advantage, deprived him of the power of exercising a free, disinterested and unbiased judgment.' ''

A similar distinction is pointed out in many of the cited cases. In the present case no personal benefit or advantage was offered or accruing to any member of the board of supervisors. The subscription tendered was purely in the interest of the tax-paying public, and its acceptance does not even suggest any improper motive.

The true doctrine applicable to this case, we believe, is set forth in the case of *Currier* v. *United States*, 184 Fed. 700, 701, decided by the Circuit Court of Appeals, involving a contract to contribute to the purchase of a site for a public building. The court says:

''The plaintiffs in error invoke the familiar rule against agreements which tend to improperly influence those engaged in the performance of public duties, or to induce them to subordinate the public welfare to individual gain.

''Assuming that we can take cognizance of their objection in a case like this, we think it is untenable. There is no charge of the receipt of a personal consideration by any representative of the government connected with the transaction, and for that reason most of the cases cited for plaintiffs in error are inapplicable. The action of the secretary was wholly free from any influence, save his judgment of the suitableness of the location and the donations toward its cost. Those donations were to the government, the public itself, not to an official, and we perceive nothing in them that would tend to public detriment. Even if they influenced him, it does not follow that the public interest was not subserved. All reasonable inferences are to the contrary. Obviously a site at least as suitable and convenient could be procured with the larger means as with smaller, and in all reasonable probability a better one, notwithstanding any claim to the contrary. Every influence upon official action is not against public policy. It is only that which is immoral in its conception or tends to impair

official fidelity or otherwise contravenes the established interests of society. . . . . It is not against public policy for the owners of a very valuable location to reduce the price to the sum appropriated by Congress, for the sake of profiting by an increase in value of their adjacent property, or for the owners of adjacent property to pay direct to the owners of the property selected and thereby reduce the cost to the government. A contribution to the government itself cannot be different in principle.

"A public building was to be erected in Greeley and a site satisfactory to the Secretary of the Treasury had to be selected. The donation in question inured to the benefit of the public. They were not given to any official for the purpose of influencing his judgment, nor to an individual to influence the judgment of an official charged with a public duty, nor was there tendency to affect the exercise of the judgment of an official contrary to the public interest. There is abundant authority for the rule that if a public institution must be located or structure built, private contributions on condition that a·particular location is selected, are not against public policy. (Citing *Island County* v. *Babcock*, 17 Wash. 438 [50 Pac. 54]; *State* v. *Johnson*, 52 Ind. 197; *Stilson* v. *Commissioners*, 52 Ind. 213; *George* v. *Harris*, 4 N. H. 533; *Ford* v. *North Des Moines*, 80 Iowa, 626 [45 N. W. 1031]; *Wells* v. *Taylor*, 5 Mont. 202 [17 Am. Dec. 446, 3 Pac. 255].)"

Most of the decisions sustaining the validity of this class of contracts subscribing to public improvements do not turn upon the construction of the subscription as a gift, but rather recognize the benefits received by the subscriber as a legitimate and binding consideration.

In *Fearnley* v. *De Mainville et al.*, 5 Colo. App. 441 [39 Pac. 73], the syllabus, as sustained by the text, recites: "A contract by which one, in consideration of another's leasing to the government a building for a post office at a nominal rent, agrees to pay to the lessor a certain sum for each month of the term is valid, notwithstanding the purpose was to enable the lessor to outstrip other competitors for the location of the office at some other point."

*Stilson* v. *Board of Commissioners*, 52 Ind. 213, and *State* v. *Johnson*, 52 Ind. 197, contain an exhaustive discussion and citation of authorities covering the question of public

policy. In the Stilson case the conclusions of the court are covered by the syllabus in the following language: "A written promise to pay into the county treasury a certain sum of money, upon the condition that the county commissioners, who had removed the county courthouse from the public square and were building a new courthouse elsewhere, would remove it back to said square, which offer was accepted by said commissioners, who entered on their records an order for such relocation, was not void as against public policy, though the commissioners were not expressly authorized by statute to receive such donations."

The court says in the opinion: "The question arising in the record was fully considered, and decided adversely to the appellant, in the case of *The State* v. *Johnson,* at the present term, *ante,* (52 Ind.) page 197. Upon authority of that case the judgment in the present case must be affirmed. The two cases differ in this, that in the above cited case there was a statute which authorized the reception of donations in money or materials, while in the present case there is no such legislative sanction. But the ruling in the present case is predicated upon the general principles of law relating to public policy, as laid down in the above cited case."

In the case last cited, the court, in discussing the question of public policy, adopted the following proposition:

"The propriety of any particular location of public buildings may depend in some measure upon the sum proposed to be given by the citizens of any place. The public interest obviously requires that such location should be made with a view to all the circumstances, and the greater or less burden to the whole state would be an important circumstance to be taken into consideration, in determining between several places, in other respects equally convenient. The increased value of the property, in the vicinity of public buildings, would seem to require that those who are benefited should contribute some part of the increase, for the purpose of erecting them, rather than that the whole advantage should accrue to them, and the expense be wholly borne by the citizens generally. We can see no foundation for the objection made to this subscription, on the ground of public policy or propriety. . . . What principle of public policy does it violate? The members of the board of police,

as individuals, will not receive any portion of the money for which the note was given. At the time of the contract it was not intended or expected that they should receive it. It was not a proposition by the defendants to pay them so much as individuals, in consideration that they would not change the site of the courthouse. If it had been it would have been clearly illegal and could not have been enforced. But the contract was made by them in their official capacity, for the benefit of the county. . . .

"But further than this, the power of courts to declare a contract void for being in contravention of sound public policy, is a very delicate and undefined power, and like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.

"After mature and thoughtful consideration, we have arrived at the conclusion that the contract sued upon is not against sound public policy. . . . The sum donated lessened the public burden and placed it upon those who would receive a personal advantage by such location. The money donated went into the fund for the erection of suitable buildings. . . . There is no pretense that there was any favoritism or partiality on the part of the governor, or the commissioners who aided them by their counsel. Nor is it claimed that a bad location was made. In a case of railroads and other *quasi* corporations, the directors are stockholders and have a personal and pecuniary interest in all donations made. Under these circumstances they might, in consulting their own interest, lose sight of the public good. In the case in judgment the governor was not subjected to any such temptation."

It would serve no useful purpose to consider all the authorities cited in detail. The general principles discussed may, however, be reinforced by calling attention to the conclusions reached by recognized commentators on the law as to where the weight of authority lies. Corpus Juris, under the subhead "Location of Public Offices," volume 13, page 437, says:

"When the general public is interested in the location of a public office, a contract to influence its location at a particular place for individual benefit or personal gain, is against public policy; although a contract which is conditioned on the location of a public building or office in a

particular place will be sustained where the use of improper influence to secure such location is not contemplated.

"Where individual contributions to secure the location of a public building or the construction of a public improvement inure to the benefit of the public, and are not given to any official for the purpose of influencing his judgment, or to an individual to influence the judgment of an official charged with a public duty, and do not tend to affect the exercise of the judgment of an official contrary to the public interest, they are not against public policy."

Ruling Case Law, one of the most careful and reliable compilations of elementary principles as adopted by the courts, on this subject says (6 R. C. L., p. 748):

"Without denying the fact that there may be circumstances under which contributions to the expense of erecting a public building might be lawful and proper to be considered in determining the best location for the public, some courts have declared that the donation of money must not be the inducement to the selection of a site apart from the public interests concerned. The argument urged against the validity of contracts tending to influence the location of public buildings is that the administrative officers charged with the duty of procuring a site are bound by virtue of their office to exercise their best judgment in procuring a location which will be most advantageous to the public, and hence it would be contrary to public policy to allow them to be influenced by external aid. But the weight of authority is in favor of the validity of a contract, the object of which is to influence the location of a public building by contributing money or property into the public fund on condition that the building shall be located at a particular place, even though the officers in charge of the construction of the building have not express legislative sanction to receive contributions. This conclusion would seem to presuppose that there is no improper motive or corrupt conduct and that the benefit of the contribution inures to the public and not to the administrative officer. It has been said that the propriety of any particular location of public buildings may depend, in some measure, upon the sum proposed to be given by the citizens of any place. The public interest obviously requires that such location should be made with a view to all the circumstances, and the greater

or less burden to the whole state would be an important circumstance to be taken into consideration, in determining between several places in other respects equally convenient. . . . In such cases contributions made on condition that the building should be erected at a particular place constitute valid agreements when accepted by the public officers.''

In the present instance, nothing appears in the record to indicate that the subscription agreements in question tended in any way to influence the board of supervisors in the selection of a site for the courthouse, beyond the legitimate consideration of the fact that the money subscribed was an element of value to the general public in selecting such location.

The judgment appealed from is reversed.

Barnard, J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 17, 1930, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 20, 1930.

All the Justices concurred.