[Civ. No. 22798. Fourth Dist., Div. One. Apr. 20, 1982.]

JOHN T. MORAN, Plaintiff and Appellant, v.
WESLEY H. HARRIS et al., Defendants and Appellants.

**COUNSEL**

Spievak & Theep and James R. Spievak for Plaintiff and Appellant.

George W. Hauer, Virginia C. Nelson, Richard H. Benes and Procopio, Cory, Hargreaves & Savitch for Defendants and Appellants.

OPINION

WIENER, J.—In *Altschul v. Sayble* (1978) 83 Cal.App.3d 153 [147 Cal.Rptr. 716], fee splitting contracts between lawyers were held to be unearned forwarding fee arrangements and unenforceable as being contrary to public policy. This appeal presents the same question under somewhat different circumstances. At the time *Altschul* was decided, Rules of Professional Conduct, rule 2-108[1] prohibited fee splitting between attorneys except to the extent that each attorney performed services and/or assumed responsibility for the case. Effective January 1, 1979, the California Supreme Court approved an amendment to the rule which effectively sanctioned forwarding fee arrangements under certain circumstances.[2] ▓▓▓ We believe this amendment indicates not only that referral fee agreements are no longer contrary to public policy, but also that they were not contrary to public policy before the original enactment of rule 2-108 (former rule 22) in November 1972. Since the referral contract at issue in this case was entered into in January 1972, we conclude public policy does not now prohibit its enforcement.

I

In December 1971, Muriel Joseph contacted her lawyer John Moran and discussed what she believed to be the negligence of Tri-City Hospital in caring for her infant granddaughter, Tashia. Moran recommended Tashia's parents should consult a lawyer with expertise in medical malpractice matters. Later, Muriel called Moran and asked him to arrange such an appointment for her son, Kenneth, and his wife, Patricia. Moran selected Gordon Von Kalinowski, an acknowledged le-

---

[1]All rule references are to the Rules of Professional Conduct.

[2]Rule 2-108 (A) currently reads: "A member of the State Bar shall not divide a fee for legal services with another person licensed to practice law who is not a partner or associate in the member's law firm or law office, unless:

"(1) The client consents in writing to employment of the other person licensed to practice law after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and

"(2) The total fee charged by all persons licensed to practice law is not increased solely by reason of the provision for division of fees and does not exceed reasonable compensation for all services they render to the client." The 1979 amendment deleted from the rule the provision, first enacted in November of 1972, that the division of fees must be "made in proportion to the services performed or responsibility assumed by each [lawyer]."

gal specialist in the medical malpractice field. Muriel, Kenneth, Patricia and Moran met with Von Kalinowski in January 1972. As a result of that meeting, Kenneth and Patricia retained Von Kalinowski to represent them. They orally agreed Von Kalinowski's contingent fee would be an unspecified percentage of the recovery, the exact percentage to be set and approved by the court in a minor's compromise. After meeting with the clients, Von Kalinowski orally agreed to split his fee equally with Moran.[3] Moran's role was to maintain communication with the Josephs and to perform those services in the case which Von Kalinowski might request. Von Kalinowski was to control the litigation.

Von Kalinowski filed the malpractice complaint on behalf of his clients against Tri-City and others in June 1972. Between February and June of that year, Moran spoke frequently with Muriel, alleviating her concern about the apparent lack of progress in the case. Sometime in the spring of 1973, because of Von Kalinowski's ill health, his work on the Joseph case bogged down.

In September, Wesley Harris learned Von Kalinowski was having some problems keeping current with his work and indicated his willingness to assume responsibility in any case which Von Kalinowski was willing to turn over to him. As a result of this solicitation, Von Kalinowski delivered 20 files to Harris, including the Joseph malpractice case. Harris agreed to be bound by Von Kalinowski's agreement with Moran.

Harris called Moran, told him he was in possession of the Joseph file, and was willing to assume responsibility in the case. Moran and Harris went to the Josephs' residence and obtained Kenneth's and Patricia's consent and signatures to the written substitution of attorneys in favor of Harris. The substitution was signed on January 14 and filed February 5, 1974. By dint of Harris' efforts through January 1975, he effected settlements with the various defendants resulting in attorney's fees of $226,996.37.

Moran's action for damages, the underlying suit here, was filed after Harris refused to honor their referral fee agreement. Bound by *Alt-*

---

[3] At the time of the agreement between Moran and Von Kalinowski, former rule 22 (the predecessor of rule 2-108) prohibiting referral fee arrangements had not yet been adopted. Thus, the contract when entered into was legal.

*schul* v. *Sayble, supra*, 83 Cal.App.3d 153, the trial court held the contract unenforceable, but nevertheless awarded Moran $25,000 as the reasonable value of his services actually rendered in the case. Pending this appeal by both parties, rule 2-108 was amended to remove the prohibition against referral fee contracts.

## II

■ As a general proposition "courts will not compel parties to perform contracts which have for their object the performance of acts against sound public policy either by decreeing specific performance or awarding damages for breach. [Citations.] This rule is not generally applied to secure justice between [the] parties [to that] contract, but from regard for a higher interest—that of the public, whose welfare demands that certain transactions be discouraged. [Citations.]" (*Takeuchi* v. *Schmuck* (1929) 206 Cal. 782, 786-787 [276 P. 345, 63 A.L.R. 408].)

■ In determining whether the subject of a given contract violates public policy, courts must rely on the state of the law as it existed at the time the contract was made. (*Stephens* v. *Southern Pacific Co.* (1895) 109 Cal. 86, 95 [41 P. 783]; *Whitmire* v. *H. K. Ferguson Co.* (1968) 261 Cal.App.2d 594, 602 [68 Cal.Rptr. 78]; *Dahlstet* v. *Dahlstet* (1969) 272 Cal.App.2d 174, 177 [77 Cal.Rptr. 45].) ■ Recognizing that the Von Kalinowski-Moran agreement which created Moran's right to a fee was executed nearly a year before former rule 22 became effective, Harris argues that the contract to be considered is instead the Harris-Moran agreement which came into being in the fall of 1973 when Harris assumed Von Kalinowski's obligations in the Joseph case.[4] Harris would then have us conclude that this new contract was unenforceable, being contrary to the express language of rule 22. We cannot agree.

Harris' argument ignores the fact that Moran's contractual right to a fee was created in January 1972. To the extent that there was one, the Harris-Moran agreement of 1973 merely allowed the transfer of an already existing contractual obligation to a new obligor (Harris). It would make little sense if a contractual interest, valid and legal at the time of its creation, could be defeated if the interest was transferred after a

---

[4]The trial court made an explicit finding that Harris assumed Von Kalinowski's obligations under the original contract. (See 1 Witkin, Summary of Cal. Law (8th ed. 1973) § 756, p. 633.)

change in the law. Were such defeat possible, the obligee (in this case, Moran) would have little choice but to veto any attempted transfer or, at a minimum, to continue to hold the transferor (Von Kalinowski) liable. We think it more sensible to evaluate the legality of this type of contract as of the time of the *creation of the contractual interest*. We must therefore focus on January 1972, the time at which Von Kalinowski agreed to pay Moran the 50 percent referral fee.

III

"[C]ourts have tended to heed the axiom that 'whatever is injurious to the public is void, on the grounds of public policy' [fn. omitted]. On this basis, a wide variety of agreements have been found ... unenforceable." (14 Williston on Contracts (Jaeger 3d ed. 1972) § 1629, p. 8.) The ease with which this general rule is stated should not mask the difficulty of its application.

"Public policy" is a vague, somewhat troublesome and malleable expression. Frequently, it has been defined in conclusionary or visceral terms. For example, "Public policy means the public good. Anything which tends to undermine that sense of security for individual rights, whether of personal liberty or private property, which any citizen ought to feel is against public policy." (*Noble* v. *City of Palo Alto* (1928) 89 Cal.App. 47, 51 [264 P. 529].) But it is exactly because of this subjective, amorphous definition and the variations in human response to the same facts, depending upon the philosophical or psychological perceptions of those involved, that courts have been cautious in blithely applying public policy reasons to nullify otherwise enforceable contracts. ■ This concern has been graphically articulated by the California Supreme Court as follows: "It has been well said that public policy is an unruly horse, astride of which you are carried into unknown and uncertain paths, ... While contracts opposed to morality or law should not be allowed to show themselves in courts of justice, yet public policy requires and encourages the making of contracts by competent parties upon all valid and lawful considerations, and courts so recognizing have allowed parties the widest latitude in this regard; and, unless it is entirely plain that a contract is violative of sound public policy, a court will never so declare. 'The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.'

[Citation.] ... 'No court ought to refuse its aid to enforce a contract on doubtful and uncertain grounds. The burden is on the defendant to show that its enforcement would be in violation of the settled public policy of this state, or injurious to the morals of its people.' [Citation.]" (*Stephens* v. *Southern Pacific Co., supra,* 109 Cal. 86, 89-90.) Although the law has a genius for creativity, correctly refusing to remain immobile in what is seen as the proper case (see, e.g., *Safeway Stores* v. *Retail Clerks etc. Assn.* (1953) 41 Cal.2d 567, 574-575 [261 P.2d 721]), juridical realization of the meandering nature of "public policy" necessitates judicial restraint. (See *Maryland C. Co.* v. *Fidelity etc. Co.* (1925) 71 Cal.App. 492, 497 [236 P. 210].) ■ Before labeling a contract as being contrary to public policy, courts must carefully inquire into the nature of the conduct, the extent of public harm which may be involved, and the moral quality of the conduct of the parties in light of the prevailing standards of the community. (See *Homestead Supplies, Inc.* v. *Executive Life Ins. Co.* (1978) 81 Cal.App.3d 978, 990 [147 Cal.Rptr. 22]; see also *Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 150-151 [308. P.2d 713].)

## IV

In *Altschul* v. *Sayble, supra,* 83 Cal.App.3d 153, the court concerned itself with the enforceability of a referral fee contract entered into before the effective date of former rule 22, which made the parties to such contracts subject to professional discipline. Acknowledging the legality of an agreement is normally determined as of the time of its making (*id.,* at p. 163; see *ante,* p. 918), the court relied on the Ethical Considerations noted in the American Bar Association Code of Professional Responsibility in concluding the contract was contrary to public policy when it was entered into. (83 Cal.App.3d at p. 163.)

Viewed with the benefit of hindsight, *Altschul's* reasoning appears precipitous and a bit myopic. The 1979 amendment to rule 2-108, eliminating the prohibition of referral fee contracts, had the effect of placing the State Bar in much the same disciplinary position it was in from 1928 (when the Supreme Court first adopted the Rules of Professional Conduct) until 1972 (when former rule 22 became effective). What *Altschul* described as the clear expression of public policy, nonexistent in the professional rules for about 44 years, disappeared after making a relatively brief appearance for about 7 years. We seriously doubt whether, in the absence of the later passage of rule 22, *Altschul*

would have held forwarding fee contracts entered into before November 1972 unenforceable as contrary to public policy.

Obviously, ethical considerations may not be ignored in determining whether conduct is contrary to public policy. Nevertheless, courts must be guided by the institutions charged with the formal responsibility of enacting laws to control that conduct. We may not encroach upon the lawmaking branch of government in the guise of public policy unless the challenged transaction is contrary to a statute or some well-established rule of law. (See *County of San Bernardino* v. *Creamery Co.* (1913) 103 Cal.App. 367, 373 [284 P. 457].) ■ Here, the fact that the Legislature, the State Bar and the Supreme Court before 1972 did not see fit to prohibit referral fee agreements is significant.

The practice of forwarding fees among lawyers, part of our legal culture (see *Turner* v. *Donovan* (1935) 3 Cal.App.2d 485, 486-487 [39 P.2d 858]), remains with us even though the detrimental effect upon the client appears obvious. "In an era where recovery in tort is founded primarily upon socialization of the loss occasioned by injury to person and property [citation], the society which bears that loss must be protected against arrangements which prevent the recovery from reaching the party injured, reduced only by necessary legal fees and other expenses of litigation. The pure referral fee, which compensates one lawyer with a percentage of a contingent fee for doing nothing more than obtaining the signature of a client upon a retainer agreement while the lawyer to whom the case is referred performs the work, is far from necessary to the injured person's recovery. To the extent that the referral fee is paid for that purpose, loss has not been socialized. Rather, the obtaining of business by a lawyer who, by his own motion, has conceded his inability to handle it has been subsidized." (*Dunne & Gaston* v. *Keltner* (1975) 50 Cal.App.3d 560, 566-567 [123 Cal.Rptr. 430] (conc. opn. of Thompson, J.).) The honoring of a referral fee is even more puzzling where the referring attorney is merely heeding the Rules of Professional Conduct in rejecting a case which he does not have the requisite skill or experience to handle competently. (See rule 6-101; *Horne* v. *Peckham* (1979) 97 Cal.App.3d 404, 414-415 [158 Cal.Rptr. 714]; see also *Lewis* v. *State Bar* (1981) 28 Cal.3d 683, 689-691 [170 Cal.Rptr. 634, 621 P.2d 258] (conc. opn. of Bird, C. J.).)

Regardless of the logic of this argument, there is another point of view. If the ultimate goal is to assure the best possible representation

for a client, a forwarding fee is an economic incentive to less capable lawyers to seek out experienced specialists to handle a case. Thus, with marketplace forces at work, the specialist develops a continuing source of business, the client is benefited and the conscientious, but less experienced lawyer is subsidized to competently handle the cases he retains and to assure his continued search for referral of complex cases to the best lawyers in particular fields. (See discussion in Morgan & Rotunda, Problems and Materials on Professional Responsibility (2d ed. 1981) pp. 261-263.)

Whether one argument is better than the other is unimportant. What is important is to recognize there are differing points of view on this subject and those points of view may well have influenced the Legislature, the Supreme Court and the State Bar to refrain from prohibiting referral fee contracts prior to 1972. Presumably, these institutions, each structurally geared to respond to its constituents or the public, acted in response to articulated perceptions.[5]

## V

Our expressed views should not be interpreted as an encouragement of referral fee agreements. Nevertheless, there is considerable distance between prohibition and encouragement. That distance may be the "breathing space" necessary to accommodate both the public nature of the legal profession and commercial milieu within which it must survive. Here, Moran did not violate any State Bar rule at the inception of the agreement; no rule would now be violated by its enforcement. Recognizing that lawyers continue to routinely participate in fee splitting arrangements with the apparent approval of those institutions charged with regulating the profession, we conclude the justice system is better served by having Harris bound by his word than by depriving Moran of the benefit of his contract.

---

[5]One of the factors considered by the State Bar and Supreme Court in their 1979 decision to amend rule 2-108 may have been the failure of former rule 22 to effect any reduction of legal costs to clients in contingent fee cases. The record in this case does not suggest otherwise. The trial court found the absence of the referral fee would not have been of any benefit to the Josephs because the majority of the fees were court approved and the balance, paid by the adult clients on a contingent basis, was modest in light of the complex litigation.

We should not presume that similar perceptions did not motivate these same institutions to refrain from prohibiting referral fee contracts before 1972.

## *Disposition*

Judgment reversed with instructions to enter judgment for plaintiff against defendants Wesley H. Harris and Wesley H. Harris, a professional corporation,[6] in the sum of $88,952.59.[7]

---

[6] In his petition for rehearing, Harris asserts that a reversal with directions to enter judgment against him is inappropriate since he pleaded an additional affirmative defense which the trial court did not rule upon. His third affirmative defense alleged: "[A]ny performance due and owing to the plaintiff by this defendant, predicated upon the contract alleged in plaintiff's complaint, was and is excused by operation of law in that subsequent to the alleged date of the alleged agreement, the conduct which forms the basis of the alleged agreement was declared unlawful."

In essence, Harris explains, his claim is that rule 2-108 as currently drafted operates as a supervening prohibition to excuse nonperformance. (See Rest.2d Contracts, § 264; Calamari & Perillo, Contracts (2d ed. 1977) § 13-4, p. 486.)

The problem with Harris' argument is that application of the doctrine of supervening prohibition presumes a *legal* conclusion that performance of the contract would be contrary to the newly enacted statute or regulation. As we have already noted, the general rule is that a subsequent change in the law will not render unenforceable a previously created contractual right. (See *ante*, p. 918.) A well-established corollary to the rule states that, "a statute is presumed to be prospective only in operation and will not be retroactively applied unless such intention clearly appears from the language of the statute itself. [Citations.]" (*Whitmire* v. *H. K. Ferguson Co., supra,* 261 Cal.App.2d at p. 602.) Both this court and the *Altschul* court (see 83 Cal.App.3d 153, 163) accepted the proposition that rule 22 did not operate retroactively to invalidate contracts entered into before November 1972. A similar conclusion must also hold true with respect to the current draft of rule 2-108. (See *ante,* fn. 2.) Thus, the legal premise for application of Harris' third affirmative defense is simply not present: Performance of the contract has not been made impossible by the enactment of rule 2-108. Consequently, there is no need to remand to the trial court for any additional factual inquiry.

[7] The sum due Moran was computed as follows:

| | | |
|---|---|---|
| Gross attorney's fees: | | $226,996.37 |

Less allowable disbursements and costs:

| | | |
|---|---|---|
| (1) Von Kalinowski | $25,000.00 | |
| (2) Medi-Legal Services | $ 9,800.00 | |
| (3) Costs | $14,291.19 | |
| Total: | $49,091.19 | |

| | |
|---|---|
| Net attorney's fees | $177,905.18 |

$$\frac{\$177,905.18}{2} = \qquad\qquad \$ 88,952.59$$

We believe the trial court erred in not allowing the Von Kalinowski and medi-legal services as legitimate charges against the gross fees. Because of Harris' successful ef-

Brown (Gerald), P. J., and Milkes, J.,* concurred.

A petition for a rehearing was denied May 13, 1982, and the petition of appellant Harris for a hearing by the Supreme Court was denied June 16, 1982. Mosk, J., was of the opinion that the petition should be granted.

---

forts under all of the circumstances of this case, he should not bear the total burden for these expenses.

*Assigned by the Chairperson of the Judicial Council.